**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | | |
|---|---|---|
| SOCRATES SHAWN | § | |
| | § | |
| *Plaintiff,* | § | |
| v. | § | CIVIL ACTION NO. |
| | § | |
| CITY OF PROGRESO, TEXAS; CESAR | § | JURY TRIAL DEMANDED |
| SOLIS, in his individual and official | § | |
| capacity; and ERNESTO LOZANO, in his | § | |
| individual and official capacity | § | |
| | § | |
| *Defendants.* | § | |

---

### PLAINTIFF SOCRATES SHAWN'S VERIFIED ORIGINAL COMPLAINT

---

## I.  PRELIMINARY STATEMENT

1.      During one of the most dangerous periods in the ongoing coronavirus pandemic, Defendants ensnared Plaintiff Socrates Shawn—then a high school senior who aspired to join the military—in an unconstitutional scheme concocted to stop and arrest anyone within City limits who crossed their path. On April 8, 2020, while traveling between his parents' homes, Mr. Shawn drove through the City of Progreso ("the City") which, unbeknownst to Mr. Shawn, had recently adopted a policy or custom of stopping and arresting anyone driving through the City. This policy or custom required City police officers to enforce Hidalgo County's COVID-19 Shelter-at-Home order by detaining without reasonable suspicion or probable cause anyone seen driving in the City while the order was in effect. Defendants' actions violated Mr. Shawn's rights under the Fourth and Fourteenth Amendments to the federal Constitution, and the rights of the many others similarly caught in Defendants' unconstitutional dragnet.

2.      Defendant Officer Ernesto Lozano ("Defendant Lozano"), acting under the direction of Defendant Chief Cesar Solis ("Defendant Solis"), stopped and detained Mr. Shawn for a "Stay at Home Violation" while Mr. Shawn was driving through the City. At no time before or during the stop did Defendant Lozano have any reasonably articulable basis to believe Mr. Shawn was violating a Shelter-at-Home Order ("SAH Order")[1] or any other law. Defendant Lozano's questioning of Mr. Shawn during the stop should have verified that Mr. Shawn was traveling lawfully according to the SAH Order's numerous exceptions. Despite this, Defendant Lozano ignored Mr. Shawn's reasonable and lawful explanation for driving home while the SAH Order was in place. Instead, on information and belief, Defendant Lozano continued to carry out Progreso and Defendant Solis' unconstitutional policy or custom by arresting Mr. Shawn without probable cause to believe he committed any criminal offense.

3.      Upon being arrested, Mr. Shawn was transported to the City of Progreso's lock-up, where Defendants and/or their agents or employees detained him for hours while they debated which offense-level to charge him with. During that time, Defendants placed Mr. Shawn in conditions that jeopardized his health. Amid an exceptionally dangerous period in the coronavirus pandemic, long before vaccines were available, Mr. Shawn was forced to interact face-to-face with Defendants, their agents or employees, and others, for extended periods of time. Defendants further held Plaintiff in conditions contrary to those set out by Centers for Disease Control and Prevention guidelines and the text of the very SAH Order Defendants purported to be enforcing. Ironically, Defendant Lozano's unconstitutional actions—pursuant to the City's and Defendant Solis's

---

[1] Hidalgo Cnty., *Second Amended Emergency Ord. Instituting Subsequent Measures Due to a Pub. Health Emergency,* 20-003 (Apr. 7, 2020), https://www.hidalgocounty.us/DocumentCenter/View/36983/04072020-Amended-Emergency-Order-20-003.

unconstitutional policy or custom—transformed a tool intended to protect public health and safety into a weapon used to indiscriminately stop and arrest anyone at will, at the cost of likely spreading the COVID-19 virus further.[2]

4.      As a result of Defendants' unconstitutional actions, Mr. Shawn suffered long-term consequences. In addition to the emotional and psychological harm he suffered from his arrest, Progreso's municipal court unlawfully assessed Mr. Shawn additional fines and fees despite his diligent attempts to dispose of his criminal case. Mr. Shawn was further hounded by debt collectors acting on behalf of the City, who attempted to extract over a thousand dollars in fines levied against him in connection with Defendants' unconstitutional acts. This forced Mr. Shawn to reevaluate his dreams of serving his country out of concern that the military would not proceed with his application while this unlawful prosecution hung over his head.

5.      This suit does not directly challenge the legality of pandemic orders, but rather the actions of Defendants in purporting to enforce them within the City. Even in the middle of a pandemic, the Fourth Amendment still applies to the conduct of police. As a result of Defendants' unconstitutional actions, Mr. Shawn requests this Court grant him compensatory and punitive damages, and enjoin Defendants from further enforcing their unconstitutional custom or policy.

## II.  JURISDICTION AND VENUE

6.      This is a civil rights action arising under 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendment to the United States Constitution.

7.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, federal question jurisdiction.

---

[2] Studies show that during this period, COVID-19 spread more quickly in non-metro areas with more people incarcerated. *See* Hooks, Gregory and Wendy Sawyer, *Mass Incarceration, COVID-19, and Cmty. Spread*, PRISON POL'Y INITIATIVE, (Dec. 2020), https://www.prisonpolicy.org/reports/covidspread.html.

*Plaintiff's Verified Original Complaint*                                      Page 3 of 23

8.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to the claim occurred in this district.

### III. PARTIES

9.      Plaintiff Socrates Shawn is a college student who Defendants subjected to an illegal stop, arrest, and policy or custom while he was lawfully traveling between his parents' homes while a senior in high school. He has lived in Hidalgo County for much of his life.

10.     Defendant Ernesto Lozano is an individual employed by the City of Progreso through its Police Department who at all times acted under color of state law. Defendant Lozano is sued in his individual and official capacities.

11.     Defendant Cesar Solis is the current chief of the City of Progreso Police Department. He is the chief law enforcement officer for Defendant City of Progreso and administers the Progreso Police Department ("PPD"), establishes and enforces policies, customs, and practices for the PPD, and provides information and advice to City officials regarding public safety. Defendant Solis is employed by Defendant City of Progreso, and at all times relevant to this complaint acted under color of state law.

12.     Defendant Solis is sued in his official capacity because he is the final policymaker for all law enforcement decisions made by Defendant City of Progreso. To the extent Defendant Solis is not a City policymaker for the conduct challenged in this Complaint, he is sued in his official capacity as an enforcement actor for purposes of injunctive relief and can be enjoined in his capacity as an enforcement actor. Even if he is not an official policymaker, his edicts and acts may fairly be said to represent official policy for the City.

13.     Defendant City of Progreso is a Texas home rule municipality organized under the laws of the State of Texas and is located in Hidalgo County. The City has the constitutional and

statutory authority to set policies and regulations. On information and belief, the City maintains policies and customs that violated Mr. Shawn's constitutional rights.

## IV. FACTUAL BACKGROUND

### A. Hidalgo County Issues Pandemic Emergency Orders

14.     As the coronavirus pandemic took hold in the United States in March 2020, local governments across Texas responded to the public health crisis by issuing emergency orders intended to slow the spread of COVID-19. These orders generally aimed to prohibit a range of conduct, including limiting the size of public gatherings, lessening the occasions for physical, public interaction, and ordering residents to "shelter at home." Texas law requires governmental entities at all levels to promulgate such plans to adequately prepare for and respond to emergencies, *see* Tex. Gov't Code Ann. §§ 418.101-418.1101 (West). To enforce these orders, state law further allows local law enforcement to levy criminal penalties for violations of "state, local, or interjurisdictional emergency management plan[s]." *Id.* § 418.173(a). The penalties assessed may not exceed a $1,000 fine or confinement in jail for longer than 180 days. *Id.* § 418.173(b).

15.     Even as these orders sought to reduce crowding, numerous exceptions allowed for a wide variety of conduct, commonly including grocery shopping, seeking medical care, exercising outdoors, traveling to and from home and work, and caring for family and pets.[3]

16.     Under this authority, on March 17, 2020, Hidalgo County Judge Richard Cortez issued an order declaring a Local Disaster Due to Public Health Emergency caused by COVID-

---

[3] *See, e.g.,* Hidalgo Cnty., *Second Amended Emergency Ord. Instituting Subsequent Measures Due to a Pub. Health Emergency,* 20-003 (Apr. 7, 2020), https://www.hidalgocounty.us/DocumentCenter/View/36983/04072020-Amended-Emergency-Order-20-003.

19.[4] The Order set out criminal penalties of up to $1,000 or 180 days confinement in jail for noncompliance, and authorized "all city, local peace officers, and law enforcement agencies […] to enforce this order." *Id*. § 3 ("Penalties"). It was the first of many such orders that the Hidalgo County Judge would promulgate in the coming months, and it addressed a variety of issues, including restricting public gatherings larger than 50 individuals and instituting price controls intended to prohibit price gouging during the pandemic. *Id*. §§ 1-2.

17.      On April 7, 2020, the Hidalgo County Judge issued an amended emergency order (the SAH Order) which added a nightly curfew to an existing provision requiring residents to "Shelter-at-Home" unless engaged in one of the many carve-out activities that were enumerated by the order.[5] This was the order in effect on the night Mr. Shawn was stopped by Defendant Lozano in Progreso on April 8, 2020.[6]  The SAH Order has two relevant parts:

     (1) the general "Shelter-at-Home" provision set out at § 1(a); and

     (2) the 11 PM curfew provision at § 1(f)(2).

18.      This amended order first requires all Hidalgo County residents to "Shelter-at-Home in their residence" unless they are engaging in the long list of protected activities listed in the Order. SAH Order §§ 1(a); A; O. This list of protected activities is expansive, enumerating several dozen reasons for which motorists could be on the road and in compliance with the SAH Order. These include, for example:

     a.  Obtaining medical supplies or medication;
     b.  Engaging in activities essential to one's health and safety or that of one's relatives;
     c.  Obtaining supplies to work from home;

---

[4] *See* Hidalgo Cnty. J. Richard F. Cortez, *Commissioners Ct. Ord.* (Mar. 17, 2020), https://www.hidalgocounty.us/DocumentCenter/View/36588/Commissioners-Court-Order-declaring-Local-Emergency-Disaster---March-17-2020.
[5] Hidalgo Cnty., *Second Amended Emergency Ord. Instituting Subsequent Measures Due to a Pub. Health Emergency,* 20-003 (Apr. 7, 2020), https://www.hidalgocounty.us/DocumentCenter/View/36983/04072020-Amended-Emergency-Order-20-003.
[6] *Id.* at 2 (noting order "EFFECTIVE AS OF 11:59 ON APRIL 7, 2020").

    d.  Buying groceries;
    e.  Hunting;
    f.  Fishing;
    g.  Visiting parks;
    h.  Engaging in outdoor exercise;
    i.  Caring for a family member, child, or pet;
    j.  Working at a place of employment permitted to operate;
    k.  Traveling to and from work; [and]
    l.  Travel required by court order[.]

    SAH Order §§ A; O.

19.    The second provision imposed a curfew, which applied to adults aged eighteen and over between the hours of 11:00 PM and 5:00 AM. Even this provision still permitted the conduct listed above as permissible reasons for leaving the home during curfew hours. SAH Order §§ 1(f)(2); A; O.

20.    Throughout 2020, while cities and counties across the State adopted emergency orders in response to the growing pandemic, enforcement of COVID-19 orders by police "varied significantly across Texas." [7] In the Rio Grande Valley, law enforcement officials "took some of the hardest lines on enforcement of COVID-19 rules in Texas." *Id.* In one example, in April 2020 alone, the City of Pharr in Hidalgo County issued at least 115 citations for violations of pandemic orders, whereas much larger cities like Austin and San Antonio issued fewer than 10 citations combined in the same period. *Id.* Ultimately, authorities in the Rio Grande Valley "issued nearly 2,000 citations to individuals for violating the orders." *Id.*

---

[7] Vianna Davila and Ren Larson, *Restrictions on the South Texas Border Were Meant to Protect People From COVID-19. Then the Handcuffs Came Out*, PROPUBLICA & TEX. TRIB. (Dec. 19, 2020), https://www.propublica.org/article/restrictions-on-the-south-texas-border-were-meant-to-protect-people-from-covid-19-then-the-handcuffs-came-out.

**B. Progreso and Defendant Solis Establish an Unconstitutional Policy or Custom of Stopping Without Reasonable Suspicion and Arresting Without Probable Cause Anyone on the Road while the SAH Order is in Effect**

21.    Soon after the first pandemic Shelter-at-Home Order was announced by Hidalgo County on March 25, 2020,[8] on information and belief, Defendant City and Defendant Solis established a policy or custom of using Hidalgo County's Shelter-at-Home Orders as pretext to stop and arrest—without reasonable suspicion or probable cause—anyone on the road. This policy or custom extended to every person traveling in a vehicle through City limits, and its effects continue today through the City's ongoing prosecution and collection of fines and fees stemming from those prosecutions.

22.    The PPD announced this policy in a message posted on Facebook on April 2, 2020. In that message, PPD explained its intent to maximize stops and arrests, stating "[there] are a few that feel that laws do not apply to them" and "[e]ffective today, April 2, 2020, we will be aggressively enforcing the Stay at Home Order and continue the enforcement period until the orders are [lifted]. ANYONE found to be in violation of [] these orders are subject to be issued a ci[t]ation with a fine not to exceed $1000.00 and/or confinement in jail for a term not to exceed 180 days." Exhibit A at 5, April 2, 2020 Facebook Post of Progreso Police Department (emphasis in original). In a comment posted by the PPD to its own April 2 post, the department noted that "The City of Progreso is following the Order issued by the County Judge." *Id*. at 6.

23.    On April 6, 2020, the PPD further added in a new Facebook post that the department "will continue to enforce that Order until further notice is given by our County Judge or" the governor, adding in a later comment that "[t]he strong enforcement by the officers is not an excuse

---

[8] Hidalgo Cnty., *Emergency Ord. Instituting Additional Measures Due To A Pub. Health Emergency Related To Corona Virus Disease (Covid-19) Shelter-At-Home Order* (Mar. 25, 2020), https://www.hidalgocounty.us/DocumentCenter/View/36748/3252020-Final-Modified-Emergency-Orders.

to ticket but an enforcement measure to keep you safe and healthy." Exhibit B at 5-6, April 6, 2020 Facebook Post of Progreso Police Department.

24.    On information and belief, Defendant Solis, as the chief law enforcement official of the City of Progreso, ratified the above statements posted by the PPD.

25.    On April 8, 2020, when Defendant Lozano arrested Mr. Shawn, Lozano directly referenced the City's unconstitutional enforcement of this policy. While still in handcuffs, Mr. Shawn asked Lozano why Lozano stopped him and not the others Shawn observed passing on the road nearby during the stop. Defendant Lozano responded that "we're trying to" do so. This statement indicates Defendant Lozano was not acting alone, but rather pursuant to a policy or custom followed by the entire PPD.

26.    Comparative enforcement data strongly suggests Defendants' use of the SAH Order was in fact nothing more than "an excuse to ticket"—despite the PPD's assurances to the public. Exhibit B at 6. As described above, larger cities in Texas such as San Antonio and Austin used the criminal enforcement penalties in similar pandemic emergency orders sparingly, issuing no more than 10 citations in April of 2020. In Hidalgo County for the same period, Progreso issued at least 68 citations, nearly as many as the approximately 115 issued by the City of Pharr under the same SAH Order despite Pharr's population being about 16 times larger than Progreso's.[9] Adjusting for population, Progreso issued citations under the SAH Order nearly 10 times more frequently than Pharr, and over 2,000 times more frequently than San Antonio and Austin. On information and belief, the reason for this wide discrepancy between municipalities is Progreso's policy of indiscriminate stops and arrests that lacked reasonable suspicion and probable cause. Like Mr.

---

[9] In 2020, Pharr's population was approximately 80,000 while Progreso's was about 5,000. U.S. CENSUS BUREAU, PHARR CITY, TEXAS QUICKFACTS (2021), https://www.census.gov/quickfacts/pharrcitytexas;  U.S. CENSUS BUREAU, PROGRESO CITY, TEXAS PROFILE (2020), https://data.census.gov/cedsci/profile?g=1600000US4859636.

Shawn, dozens of these stops and arrests involved the City of Progreso's policing of the SAH Order alone.

### C. Despite Dozens of Exceptions for Motorists on the Road, Defendant Lozano Stopped Mr. Shawn without Reasonable Suspicion Based on Progreso's Unconstitutional Policy or Custom

27.    On the evening of Wednesday, April 8, 2020, Plaintiff Socrates Shawn was spending time with his father at his home in Progreso Lakes in Hidalgo County. Pursuant to his parents' court-ordered divorce decree, Mr. Shawn planned to travel to his mother's house in McAllen, about 25 miles away, as he did every Wednesday evening. According to the decree, Mr. Shawn must split his time between both his parents' homes; spending four days a week at his mother's McAllen home and the remaining three days at his father's in Progreso Lakes.

28.    Mr. Shawn was aware that Hidalgo County had recently imposed emergency orders when he planned to travel home to his mother's house, but believed his travel between his parents' homes was lawful under the Order, and understood that the curfew did not begin until later in the evening. The curfew in fact would not start for nearly two hours after he left his father's home at 9 PM, and Mr. Shawn believed neither the SAH Order nor its curfew would be a concern for his travel to McAllen since his trip home usually took only about 30 minutes. In fact, travel by court order was explicitly permitted as an exception in the SAH Order. *See* SAH Order § O(3)(f).

29.    At about 9:20 PM, shortly after he left Progreso Lakes, Mr. Shawn saw police lights flash as he was traveling along Highway FM 1015 through the City of Progreso. He realized a police officer was pulling him over, but was unsure why. He pulled over along the side of the road on Highway FM 1015, and Defendant Lozano approached his vehicle.

30.    According to the Arrest Report filed by Defendant Lozano, Lozano stopped Mr. Shawn when he "noticed a vehicle traveling north on FM 1015" and, as a result "proceeded to conduct a traffic stop Due to the Stay at Home Ordinance Violation (Covi[d]-19).". Exhibit C at

2, Arrest Report of Socrates Shawn. According to his own report, then, Defendant Lozano had no articulable suspicion that Mr. Shawn was violating the law. Instead, his sole basis for conducting the stop was a generalized intent to enforce the SAH Order, based on nothing more than his observation that Mr. Shawn was driving while the SAH Order was in effect.

31.     When he pulled Mr. Shawn over having observed nothing more than Mr. Shawn's presence on the road, Defendant Lozano lacked reasonable suspicion to conduct the stop. Because the operative SAH Order contained several dozen broad exceptions that permitted lawful travel, mere presence outside the home was not enough give rise to reasonable suspicion. When Defendant Lozano observed Mr. Shawn traveling in his vehicle in a lawful manner and decided to stop him, he had no reasonably articulable basis to believe Mr. Shawn was traveling in violation of the SAH Order. It was just as plausible, if not more plausible, that Mr. Shawn was traveling in order to buy groceries, to care for a family member, to go to or return from work, to obtain medical care, to exercise outdoors, or to engage in one of the dozens of other permissible activities listed in the SAH Order. *See supra* ¶ 18; SAH Order §§ A; O.

32.     Moreover, though arrest and citation records identify a "Stay at Home Violation" as the basis for Mr. Shawn's arrest, municipal court records provide that Mr. Shawn was charged with a "Curfew" violation. If the SAH Order on its own provided no basis to stop Mr. Shawn in the first place, a curfew violation provided even less of a basis: Mr. Shawn was stopped at 9:20 PM, nearly two hours before the SAH Order's Curfew provisions took effect at 11 PM. *See* SAH Order § 1(f)(2). Thus, to the extent Defendant maintain that Defendant Lozano's stop of Mr. Shawn was based on a curfew violation, the decision to stop Mr. Shawn was even more clearly unlawful because no curfew was in effect at the time Defendant Lozano unconstitutionally stopped Mr. Shawn. Thus, with the information available to him at the time of the stop, Defendant Lozano

plainly lacked reasonable suspicion to detain Mr. Shawn and, as discussed below, similarly lacked probable cause to arrest Mr. Shawn.

### D. Defendant Lozano Arrested Mr. Shawn without Probable Cause Subject to Progreso's Unconstitutional Policy or Custom

33.     After Defendant Lozano pulled Mr. Shawn over, Lozano walked up to Mr. Shawn's vehicle and Mr. Shawn greeted him, telling him "Good evening." Defendant Lozano explained the alleged basis for the stop, telling Mr. Shawn that he noticed him driving "past curfew" despite the fact that Hidalgo County's SAH Order Curfew did not begin for nearly two hours and that the SAH Order provided many reasons for lawful travel at all hours of the day. *See* SAH Order § 1(f)(2) (curfew begins at 11 PM); Exhibit C at 4 (making no mention of curfew but stating Defendant Lozano told Mr. Shawn he was in violation of the SAH Order and was arresting him because "he should not be visiting anyone").

34.     Defendant Lozano questioned Mr. Shawn, asking him where he was going. Mr. Shawn replied he was going home. Defendant Lozano asked where his home was located. Mr. Shawn responded that he had two homes, in McAllen and Progreso Lakes. As described above, the SAH Order's many exceptions described numerous situations in which traveling to one's home was explicitly permissible, including traveling between home and work, buying groceries, caring for relatives, and engaging in activities essential to one's health and safety. SAH Order §§ A; O.

35.     Mr. Shawn's answers to Defendant Lozano's questions should have caused Defendant Lozano to question whether his continued detention of Mr. Shawn was reasonable. Indeed, when Mr. Shawn first mentioned that he was traveling between his parents' homes, Defendant Lozano was on notice that one or more of the SAH Order's many reasons for lawful travel might apply. He therefore had a duty to let Mr. Shawn go, or to inquire further to determine whether his prolonged stop of Mr. Shawn was justified – but Defendant Lozano did neither.

36.     In fact, Mr. Shawn's travel was at a minimum lawful under an exception to the SAH Order permitting travel by court order, because he was traveling pursuant to his parents' court-ordered divorce decree. *See* SAH Order §§ O ("All Travel is prohibited except for Essential Travel that is identified herein"); O(3) ("'Essential Travel' includes travel for any of the following purposes:"); O(3)(f) ("Travel required by First Responders, Law Enforcement or *court order*") (emphasis added).

37.     After finishing his initial questioning of Mr. Shawn, Defendant Lozano returned to his police vehicle, while Mr. Shawn remained sitting in his car. Mr. Shawn believed that he would likely be released without incident, because he was not driving during the Hidalgo County curfew and to his knowledge had not violated any provision of the SAH Order.

38.     Instead, several minutes later Defendant Lozano returned to Mr. Shawn's vehicle and instructed Mr. Shawn to "get out of the car." Mr. Shawn was surprised and confused, but complied and exited his vehicle. Again, Defendant Lozano falsely told Mr. Shawn he was "out past curfew" and instructed him that he was being placed under arrest. Defendant Lozano then placed Mr. Shawn in handcuffs as several nearby police officers who had since arrived on-scene looked on. *See* Exhibit C at 4 (making no mention of curfew but stating Defendant Lozano told Mr. Shawn he was in violation of the SAH Order and was arresting him because "he should not be visiting anyone"); *contra* SAH Order §§ A, O (listing numerous permissible reasons for visiting others).

39.     While handcuffed, Mr. Shawn asked Defendant Lozano why he was being arrested. Defendant Lozano stated that Progreso had a different curfew. When Mr. Shawn then asked Defendant Lozano why he was not also stopping others he observed passing on the road during the stop, Defendant Lozano replied, "we're trying to." *See* Exhibit C (making no mention of

different curfew). On information or belief, Defendant Lozano's response was in reference to the City of Progreso and Defendant Solis' unconstitutional policy of indiscriminately stopping and arresting motorists, which Defendant Lozano was under orders to carry out as an employee of the City.

40.    Defendant Lozano told Mr. Shawn that his vehicle was going to be towed, that he would be transported to the PPD where he would be interrogated, and that based on this interrogation he would be charged with either a Class B or Class C Misdemeanor. Mr. Shawn asked what the difference was, and was told by Defendant Lozano that under a Class C he would be charged $1,000 and would be allowed to leave, while a Class B would mean he would be taken to County jail.  Mr. Shawn asked if he would be permitted to make a phone call, and Defendant Lozano said he would discuss that at the police station.

41.    Lozano then drove Mr. Shawn to Progreso's police station. At the station, Mr. Shawn was fingerprinted and placed in a holding cell in the city jail. At the same time, Defendants impounded Mr. Shawn's vehicle. After being placed in the jail cell, Mr. Shawn was permitted to make a phone call and called his father.  Defendants and or their agents or employees then told him that he would be charged with a Class C Misdemeanor, and would only face a $1,000 fine. *But see* Exhibit C at 2 (noting classification of arrest as "Misdemeanor Class B"). About two hours after being arrested, Mr. Shawn was released.

42.    Mr. Shawn's experience in a single evening at the hands of Defendants is emblematic of an unconstitutional policing policy or custom at work. At a time in which the edicts of nearly every public health official in the country were to minimize contact between individuals to prevent the spread of a deadly and contagious disease, Defendants used the pandemic as an excuse to disregard fundamental constitutional precepts in order to pull over as many people as

they could. To Defendants, the mere sight of anyone driving on the road, without a shred of additional articulable fact to indicate a violation of law, was enough to stop Mr. Shawn and others. That conducting a traffic stop based on not a single observable fact to indicate criminal wrongdoing is a violation of a person's Fourth Amendment rights was not only clearly established on the night of April 8, 2020, but should have been overtly clear to every single law enforcement agent in the County. Such a policy or custom exposed Mr. Shawn, his family, Defendant Lozano, and others to needless physical interactions at an exceptionally dangerous time during the pandemic.

43.     Thereafter, Defendant Lozano applied a similar disregard for the individual facts of Mr. Shawn's case when he decided to arrest him without probable cause. Defendant Lozano flatly ignored the multitude of permissible reasons for travel even during this time, despite Mr. Shawn's pleading that he was simply traveling between the two places he called home. With no further inquiry or investigation into whether Mr. Shawn was actually committing an offense under the SAH Order, Defendant Lozano arrested Mr. Shawn, jailing him for several hours. This exposed Mr. Shawn, Mr. Shawn's father, Defendants, and others in the jail to needless and highly risky face-to-face interactions.

44.     On information and belief, Defendant Lozano was acting pursuant to a municipal custom or policy adopted by Defendant City of Progreso through its Chief of Police, Defendant Cesar Solis, to use the Hidalgo County SAH Order as cover to stop and arrest anyone observed driving through the City while the SAH Order was in effect. Under this policy or custom, officers of the PPD were instructed to stop anyone observed on the roads in Progreso in order to enforce the SAH Order's provisions, even when an officer had no independent, reasonably articulable basis to believe that an individual was violating the SAH Order or any other law.

45.    Defendant Solis knew or should have known of the policy or custom, and was deliberately indifferent to its existence.

46.    On information and belief, Defendant Lozano was instructed by his superiors to enforce Progreso's unconstitutional policy or custom by stopping anyone he encountered while on duty under the guise of enforcing the SAH Order, regardless of whether he had an independent basis to believe those he stopped were in fact violating the SAH Order. Mr. Shawn was one such person who Defendant Lozano stopped in carrying out the City's unconstitutional custom or policy. The City's unconstitutional policy or custom was therefore the moving force of the constitutional deprivations suffered by Mr. Shawn when he was stopped and arrested by Defendant Lozano.

47.    Even in the context of an ongoing pandemic, Fourth Amendment limitations remain paramount. This suit does not challenge the legality of the pandemic orders described above, but rather the actions of Defendants in purporting to enforce them in Progreso. Federal law is the supreme law of the land. As such, any policy, regardless of its legality under state law, must be enforced in conformance with the federal Constitution, which is not suspended during health emergencies. Nonetheless, on information and belief Defendants proceeded with an unconstitutional enforcement scheme that exposed Mr. Shawn and many others to health risks and forced him to engage in an extended effort to resolve the unlawful charges lodged against him long after the easing of the pandemic orders themselves.

## V.  CLAIMS FOR RELIEF

### A. Count One: Defendant Lozano Violated Mr. Shawn's Rights under the Fourth and Fourteenth Amendments by Stopping him without Reasonable Suspicion

48.    Plaintiff incorporates by reference the allegations in paragraphs 1-47.

49.     The protections of the Fourth Amendment have been incorporated against the states through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). Law enforcement may stop people only when they have "reasonable suspicion supported by articulable facts that criminal activity may be afoot," or run afoul of the protections afforded by the Fourth Amendment. *United States v. Jacquez*, 421 F.3d 338, 340-41 (5th Cir. 2005) (internal quotations omitted); *see Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). "An officer's mere hunch or unparticularized suspicion is not sufficient; rather, a minimal level of objective justification for the stop must be present." *Jacquez* at 341. A stop not supported by reasonable suspicion at the outset does not retroactively become lawful just because an officer develops reasonable suspicion later on. *See Terry*, 392 U.S. at 19-23 (asking first whether an officer's action was "justified at its inception"); *see also Ligon v. City of New York*, 925 F. Supp. 2d 478, 538 (S.D.N.Y. 2013) (evidence of a systematic pattern of unlawful *Terry* stops bolstered conclusion that officers were incorrectly trained to "stop and question first, develop reasonable suspicion later").

50.     Defendant Lozano stopped Mr. Shawn in violation of the Fourth and Fourteenth Amendments because Lozano lacked reasonable suspicion that Mr. Shawn violated the SAH Order or any other law. Lozano stopped Mr. Shawn without observing him commit any overt violation of the law. Moreover, the operative SAH Order provided for dozens of legitimate reasons why it was permissible for a motorist to be on the road while the SAH Order was in effect. One's mere presence on the road while the SAH Order was in effect was thus not enough to give Defendant Lozano reasonable suspicion to stop Mr. Shawn.

51.     The right to be free from these types of suspicionless stops was long established and settled on the evening Defendant Lozano conducted this stop. No reasonable officer

confronted with these same circumstances would have concluded that they had reasonable suspicion to effectuate the stop of Mr. Shawn on this basis.

52.    Additionally, Defendant Lozano lacked reasonable suspicion to stop Mr. Shawn under the SAH Order's Curfew provision because Lozano initiated the stop nearly two hours before the curfew began. Likewise, no reasonable officer would have concluded they had reasonable suspicion to effectuate the stop of Mr. Shawn on the basis that he was violating an inactive curfew order.

**B. Count Two: Defendant Lozano Violated Mr. Shawn's Rights under the Fourth and Fourteenth Amendments by Arresting him without Probable Cause**

53.    Plaintiff incorporates by reference the allegations in paragraphs 1-52.

54.    The protections of the Fourth Amendment have been incorporated against the states through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655-56 (1961). Every arrest must be supported by probable cause to not violate the Fourth Amendment. *United States v. Raborn*, 872 F.2d 589, 593 (5th Cir. 1989).

55.    Defendant Lozano unlawfully arrested Mr. Shawn in violation of the Fourth and Fourteenth Amendments because Lozano's observations and questioning of Mr. Shawn did not provide him with enough information to conclude he had probable cause that Shawn violated the SAH Order or any other law. All Defendant Lozano gleaned from his questioning of Mr. Shawn was that Shawn was traveling between his parents' homes—a lawful basis for travel under many exceptions to the SAH Order. Defendant Lozano nonetheless arrested Mr. Shawn for a SAH Order violation.

56.    Defendant Lozano lacked probable cause to place Mr. Shawn under arrest, because dozens of exceptions to the SAH Order existed—many of which involved permissive travel to and

from the home—and because Mr. Shawn provided no other basis for Defendant Lozano to believe that Shawn violated the SAH Order.

57.    The right to be free from such a baseless arrest was long established and settled on the evening Defendant Lozano conducted this stop.  No reasonable officer confronted with the same circumstances would have concluded that they had probable cause to arrest Mr. Shawn based on the information known to them at that moment.

### C.  Count Three: Defendants City of Progreso and Solis Violated Mr. Shawn's Fourth and Fourteenth Amendment Rights by Subjecting Him to an Unconstitutional Custom or Policy they Promulgated

58.    Plaintiff incorporates by reference the allegations in paragraphs 1-57.

59.    Municipal liability for constitutional violations attaches when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated" by a municipality, or the challenged action is one based on municipal "custom." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978). Such policies or customs may come from not only official "lawmakers," but also from "those whose edicts or acts may fairly be said to represent official policy." *Id*. at 694.

60.    As Police Chief of Progreso, Defendant Solis is the City's chief law enforcement officer and is a policymaker for the City. Even if he is not an official policymaker, his edicts and acts may fairly be said to represent official policy for the City.

61.    On information and belief, Defendant Solis and the City promulgated, knew of, or should have known of, a policy or custom of stopping and arresting anyone seen in a vehicle within the City of Progreso while County pandemic emergency orders were in effect in violation of the Fourth and Fourteenth Amendments to the federal Constitution.

62.    Defendant Solis was deliberately indifferent to this policy or custom.

63.     On information and belief, the violations of Mr. Shawn's constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution, Mr. Shawn's damages, and the conduct of Defendant Lozano were directly and proximately caused by the policy or custom. The policy or custom was the moving force leading to Defendant Lozano's violations of Mr. Shawn's constitutional rights under the Fourth and Fourteenth Amendments.

## VI.  DEMAND FOR JURY

64.     Mr. Shawn hereby demands a trial by jury.

## VII.    REQUEST FOR RELIEF

65.     WHEREFORE, Plaintiff requests this Court grant the following relief:

    i.      Award compensatory damages to Socrates Shawn as to Defendants;

    ii.     Award punitive damages to Socrates Shawn as to Defendants Lozano and Solis;

    iii.    Enjoin Defendants from enforcing their unconstitutional custom or policy in Progreso;

    iv.     An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and any other relief this Court deems just and proper.

.Dated: April 7, 2022

Respectfully submitted,

*/s/ Erin D. Thorn*
Erin D. Thorn
State Bar No. 24093261
SDTX Bar No. 2744303
(956) 787-8171 ext. 127
erin@texascivilrightsproject.org
*Attorney-in-Charge for Plaintiff*

Ricardo A. Garza
State Bar No. 24109912
SDTX Bar No. 3336127
(956) 787-8171 ext. 122
ricky@texascivilrightsproject.org
*Attorney for Plaintiff*

Peter Steffensen
State Bar No. 24106464
SDTX Bar No.  3327006
(512) 474-5073 ext. 101
peter@texascivilrightsproject.org
*Attorney for Plaintiff*

Laura Peña
State Bar No. 24085758
SDTX Bar No. 3326963
(956) 787-8171 ext. 147
laura@texascivilrightsproject.org
*Attorney for Plaintiff*

TEXAS CIVIL RIGHTS PROJECT
P.O. Box 219
Alamo, Texas 78516
Tel: (956) 787-8171

**ATTORNEYS FOR PLAINTIFF
SOCRATES SHAWN**

**VERIFICATION**

STATE OF TEXAS §
§
COUNTY OF Hidalgo §

Socrates Shawn, being duly sworn, deposes and says:

I am Socrates Shawn, the Plaintiff in this action; I have read the foregoing Verified Original Complaint and know the contents thereof; except as to matters therein alleged on information and belief, I have learned of the facts alleged therein, either through my own personal knowledge or through information reported to me in the ordinary course of business; as to those matters as to which I do not have personal knowledge, I believe them to be true.

Socrates Shawn

Sworn to and subscribed to me by Socrates Shawn on this the 30th day of March, 2022.

GEORGINA GUZMAN
Notary Public, State of Texas
Comm. Expires 02-18-2025
Notary ID 10402593

Notary Public in and for the
State of Texas

**CERTIFICATE OF SERVICE**

I, Erin D. Thorn, hereby certify that a copy of the foregoing Verified Original Complaint

will be timely served on all Defendants in accordance with the Federal Rules of Civil Procedure.

*/s/ Erin D. Thorn*
Erin D. Thorn